**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| IN RE: ) <br> CYNTHIA A. DAVIS, ) <br>       DEBTOR. ) <br> _____ ) <br> STATE OF CONNECTICUT ) <br> DEPARTMENT OF LABOR, ) <br>       PLAINTIFF ) <br> ) <br> v. ) <br> ) <br> CYNTHIA A. DAVIS, ) <br>       DEFENDANT. ) <br> _____ ) | CHAPTER      7 <br><br> CASE NO.:      14-31962 (JAM) <br><br> ADV. PRO. NO.    15-03009 <br><br> RE: ECF NO.      1 |

**APPEARANCES**

APPEARANCES:

| | |
|---|---|
| Lawrence G. Widem, Esq. <br> Office of the Attorney General <br> 55 Elm Street <br> P.O. Box 120 <br> Hartford, CT 06141-0120 | Attorney for the Plaintiff |
| Cynthia A. Davis <br> 724 Savin Avenue <br> Apt. D-2 <br> West Haven, CT 06516 | Pro Se |

**MEMORANDUM OF DECISION ON COMPLAINT**
**TO DETERMINE DISCHARGEABILITY OF DEBT**

JULIE A. MANNING, Chief United States Bankruptcy Judge

**I.    INTRODUCTION**

On March 31, 2015, the State of Connecticut, Department of Labor (the "Plaintiff") filed

a two count complaint (the "Complaint"), in this adversary proceeding. The first count of the

Complaint seeks to have a debt owed to the Plaintiff by the Debtor, Cynthia A. Davis (the

"Defendant"), deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).  The second count of the Complaint seeks to have administrative penalties assessed against the Defendant pursuant to Connecticut General Statues § 31-273(b)(2) deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(7).  A trial was held in this matter on May 26, 2016.  For the reasons that follow, judgment will enter in favor of the Defendant and against the Plaintiff on the Complaint.

## II.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings pursuant to 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (b)(1).  This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(I).

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52, made applicable to this matter through Federal Rule of Bankruptcy Procedure 7052, the following are the Court's findings of fact and conclusions of law:

### A.    Findings of Fact

1. The Defendant first filed a claim for unemployment compensation benefits on September 28, 2008.  (Plaintiff's Exhibit B).  At that time, the Defendant provided personal and employment information to the Plaintiff.  A representative of the Plaintiff recorded the Defendant's information into the Plaintiff's computer system, which created a claimant file for the Defendant.  (Testimony of Jill Pienkos at May 26, 2016 trial).

2. When a claimant files an initial claim, he/she speaks with a representative of the Plaintiff who provides information about the claims process.  It is the Plaintiff's practice

to advise claimants that mistakes or inaccuracies in their answers to claims questions could affect their benefits or their eligibility for benefits. (Testimony of Jill Pienkos at May 26, 2016 trial).

       3.      It is also the Plaintiff's practice to mail a claimant a booklet regarding his/her rights and responsibilities, which informs claimants of the requirements to remain eligible for benefits. The booklet is called "Unemployment Insurance: A Guide to Collecting Benefits in the State of Connecticut" (the "Unemployment Guide"). (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit KK).

       4.      After a claimant submits an initial claim for unemployment compensation benefits, the claimant may submit continued claims on a weekly basis and the Plaintiff will then assess the claimant's continued eligibility for benefits. Weekly continued claims are submitted over the phone. (Testimony of Jill Pienkos at May 26, 2016 trial).

       5.      The Defendant filed continued claims for unemployment compensation benefits for various weeks throughout the period ending on October 30, 2011. (Plaintiff's Exhibits C, D, F, G).

       6.      It is the Plaintiff's practice to mail claimants a copy of the Unemployment Guide each time they file an initial claim for unemployment benefits. The Plaintiff would have mailed the Unemployment Guide to the Defendant at her address of record each time she filed an initial claim for benefits. (Testimony of Jill Pienkos at May 26, 2016 trial).

       7.      The Unemployment Guide instructs claimants how to file continued claims and outlines six specific questions that the Plaintiff asks when a claimant submits a continued claim for benefits over the phone. Page nine of the Unemployment Guide lists the six questions and provides instructions on how to respond. The Unemployment Guide also contains

Case 15-03009    Doc 20    Filed 03/30/17    Entered 03/30/17 16:06:37    Desc Main
          Document      Page 4 of 16

warnings advising claimants that they must report all wages to the Plaintiff.   (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit KK).

8. The Plaintiff captures and records the information that claimants report in response to the six questions each time they file a continued claim for benefits.   The Plaintiff records the date of the call, and, if the individual reported any wages, the name of the employer, the hours the individual reported, and the wages that the individual reported.   (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibits N, T, FF, GG).

9. The six questions listed in the Unemployment Guide were asked of the Defendant each time she submitted a continued claim for benefits.   The Defendant submitted her continued claims over the phone.   The Defendant was prompted by specific questions to answer "yes" or "no", and then to either say the word "yes" or "no" or push a button on her phone to indicate her "yes" or "no" answer.   When the Defendant submitted continued claims over the phone, there was not a live person on the other end of the phone.   The Plaintiff recorded the voice response/keypad answers that the Defendant provided when she submitted her weekly claims.   (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibits M, S).

10. The Plaintiff considers the voice response/keypad answers claimants provide to be the representations of claimants as part of the application process for continued unemployment benefits.   The Plaintiff relies upon the information recorded in a claimant's data records in determining whether to continue to pay claims.   (Testimony of Jill Pienkos at May 26, 2016 trial).

11. When the Defendant called to submit her continued claims for benefits, the Defendant verified her identity by entering her social security number and a personal

4

identification number assigned by the Plaintiff. Once the Defendant entered the correct information, the system would ask her the questions. (Testimony of Jill Pienkos at May 26, 2016 trial).

        12.    The Defendant received unemployment compensation benefits from the Plaintiff for each week she reported that she had not earned any wages during the prior week. The Defendant made these claims by responding to the "yes" or "no" questions by either providing a verbal response or by indicating her response on her telephone keypad. (Testimony of Jill Pienkos at May 26, 2016 trial).

        13.    The Plaintiff relied upon the Defendant's claims in paying to her the maximum weekly unemployment compensation benefit amount. (Testimony of Jill Pienkos at May 26, 2016 trial).

        14.    The Plaintiff's Benefit Payment Control Unit conducted three audits which revealed that the Defendant received unemployment compensation benefits when she was employed by, performed work for, earned wages from, and was paid earned wages by her employer, the Hospital of Saint Raphael. (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibits J, R, HH).

        15.    On December 31, 2009, the Plaintiff's Overpayment Division finalized a report that the Defendant had been overpaid $4,631.00 for various weeks between the weeks ending January 3, 2009 through June 27, 2009, and October 10, 2009 through November 14, 2009. On February 8, 2010, the Plaintiff's Overpayment Division finalized a report that the Defendant had been overpaid $2,551.00 for various weeks between the weeks ending July 4, 2009 through September 26, 2009. On March 19, 2012, the Plaintiff's Overpayment Division

finalized a report that the Defendant had been overpaid $5,496.00 for various weeks between the weeks ending July 10, 2010 through October 12, 2011 (collectively, the "Overpayment Weeks"). (Plaintiff's Exhibit H, O, EE).

16. The Plaintiff determined that the Defendant had been overpaid during the Overpayment Weeks after the Hospital of Saint Raphael reported wages for the Defendant for all of the quarters that the Defendant received unemployment compensation benefits from the Plaintiff. The Plaintiff's Overpayment Division determined that these wages were not reported when the Defendant filed her continued unemployment claims. The Plaintiff made three separate determinations that the Defendant was overpaid unemployment benefits by reviewing a breakdown of the Defendant's weekly wages provided by her employer and matching them up with the claims filed by the Defendant. (Plaintiff's Exhibits I, P, Q, EE).

17. On December 3, 2009, the Plaintiff sent the Defendant a letter stating that it had made a preliminary determination that the Defendant had been overpaid unemployment compensation in the amount of $4,631.00 with an administrative penalty, because the Defendant failed to properly report earnings from the Hospital of Saint Raphael for the weeks ending January 3, 2009 through June 27, 2009, and October 10, 2009 through November 14, 2009 (the "December 2009 Letter"). (Plaintiff's Exhibit II).

18. The December 2009 Letter advised the Defendant that she had a right to a hearing by an Unemployment Compensation examiner to address whether she was overpaid benefits and whether such overpaid benefits were received because she knowingly failed to disclose a material fact. The Defendant never requested a hearing in response to the December 2009 Letter. (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit II).

19. On December 31, 2009, the Plaintiff sent the Defendant a final determination letter stating that that Plaintiff had made a determination, based on a review of the Defendant's case file and the Defendant's failure to request or attend a hearing, that the Defendant's unemployment compensation account was overpaid by $990.00 (the "First Final Determination Letter"). The Defendant was advised that she had twenty-one (21) days to appeal the Plaintiff's determination. (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit JJ).

20. On January 11, 2010, the Plaintiff sent the Defendant a letter stating that the Plaintiff had made a preliminary determination that the Defendant had been overpaid unemployment compensation in the amount of $2,551.00 with an administrative penalty, because the Defendant failed to properly report earnings from the Hospital of Saint Raphael for the weeks ending July 4, 2009 through September 26, 2009, and November 21, 2009 through November 28, 2009 (the "January 2010 Letter"). (Plaintiff's Exhibit V).

21. The January 2010 Letter advised the Defendant that she had a right to a hearing by an Unemployment Compensation examiner to address whether she was overpaid benefits and whether such overpaid benefits were received because she knowingly failed to disclose a material fact. The Defendant never requested a hearing in response to the January 2010 Letter. (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit V).

22. The Defendant does not recall receiving the January 2010 Letter or any other letter from the Plaintiff. (Testimony of Cynthia Davis at May 26, 2016 trial).

23. On February 8, 2010, the Plaintiff sent the Defendant a final determination letter stating that that Plaintiff had made a determination, based on a review of the Defendant's

7

case file and the Defendant's failure to request or attend a hearing, that the Defendant's unemployment compensation account was overpaid by $2,551.00 (the "Second Final Determination Letter"). The Second Final Determination Letter advised the Defendant that she had twenty-one (21) days to appeal the Plaintiff's determination. (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit U).

24. On January 26, 2012, the Plaintiff sent the Defendant a letter stating that the Plaintiff had made a preliminary determination that the Defendant had been overpaid unemployment compensation in the amount of $5,292.00 with an administrative penalty, because the Defendant failed to properly report earnings from the Hospital of Saint Raphael for the weeks ending July 10, 2010 through October 1, 2011 (the "January 2012 Letter"). (Plaintiff's Exhibit J).

25. The January 2012 Letter advised the Defendant that she had a right to a hearing by an Unemployment Compensation examiner to address whether she was overpaid benefits and whether such overpaid benefits were received because she knowingly failed to disclose a material fact. The Defendant never requested a hearing in response to the January 2012 Letter. (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit J).

26. On March 19, 2012, the Plaintiff sent the Defendant a final determination letter stating that that Plaintiff had made a determination, based on a review of the Defendant's case file and the Defendant's failure to request or attend a hearing, that the Defendant's unemployment compensation account was overpaid by $5,496.00 (the "Third Final Determination Letter"). The Defendant was advised that she had twenty-one (21) days to appeal the Plaintiff's determination. (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's

Exhibit J).

27. The Defendant never requested a hearing, never effected an appeal, never asked to go before an adjudicator, and never asked that the Plaintiff review her case with regard to the First, Second, or Third Final Determination Letter. (Testimony of Jill Pienkos at May 26, 2016 trial).

28. The Plaintiff maintains records of weekly payments that were made to the Defendant for the weeks that unemployment benefits were claimed. (Plaintiff's Exhibits K, L).

29. The Plaintiff paid the Defendant a total of $12,678.00 in unemployment benefits for which the Defendant was not eligible (the "Overpayments"). (Testimony of Jill Pienkos at May 26, 2016 trial; Plaintiff's Exhibit A).

30. The Plaintiff also assessed a total of 39 weeks in administrative penalties against the Defendant in connection with the Overpayments. (Testimony of Jill Pienkos at May 26, 2016 trial).

31. The Defendant believes that the Plaintiff's records of her responses showing that she said she was not working when she was are inaccurate. (Testimony of Cynthia Davis at May 26, 2016 trial).

32. The Defendant maintains that she "did not commit a fraud", "did not lie on the application", and "did what was right to my knowledge." (Defendant's Answer dated June 8, 2015).

33. The Defendant testified that she has never lied to the Plaintiff or said that she was not working when she was. The Defendant testified that when she filed her claims for unemployment benefits, she always said that she was working reduced hours. (Testimony of

9

Cynthia Davis at May 26, 2016 trial).

### B. Conclusions of Law

#### 1. Dischargeability of Unemployment Benefits

While the Bankruptcy Code provides a debtor with a "fresh start," this unencumbered new beginning is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991), *citing Local Loan Co. v. Hunt*, 292 U.S. 234 (1934). The statutes governing nondischargeability of debts reflect a congressional decision to "exclude from the general policy of discharge certain categories of debt." *Id.* at 287. In *Grogan*, the Supreme Court established that in order for a plaintiff to prevail on her claims, nondischargeability must be proven by a preponderance of the evidence. *Id.*

#### a. False Pretenses, False Representations, or Actual Fraud

Count one of the Complaint alleges that the Defendant obtained unemployment compensation benefits by means of false representations and/or actual fraud in that the Defendant knowingly and fraudulently represented to the Plaintiff that she had not earned any wages and was legally eligible to receive unemployment benefits. (Complaint, ¶4). Section 523(a)(2)(A) provides that a debt "for money, property, services, or an extension, renewal, or refinancing of credit" will be deemed nondischargeable "to the extent obtained, by . . . false pretenses, a false representation, or actual fraud". The Section 523(a)(2)(A) analysis for nondischargeability based on fraud requires that the creditor prove, by a preponderance of the evidence, that:

> (1) the debtor made the representations; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representations; and (5) the creditor sustained the alleged loss and damage as the proximate result of

10

the representation having been made.

*Michalek v. Ochs* (*In re Ochs*), 516 B.R. 213, 218 (Bankr. D. Conn. 2014). The false representation giving rise to the debt must be knowingly and fraudulently made. *F.D.I.C. v. Roberti* (*In re Roberti*), 201 B.R. 614 (Bankr. D. Conn. 1996). "For misrepresentation to be 'fraudulent' for purposes of the actual fraud discharge exception, it must be made with scienter, that is, debtor must know or believe that statement is false. *In re Alicea*, 230 B.R. 492 (Bankr. S.D.N.Y. 1999) (citations omitted).

The Complaint alleges that the Defendant applied for unemployment compensation benefits and that the Plaintiff provided the Defendant with benefits for which she was not eligible for various weeks between the weeks ending January 3, 2009 through November 28, 2009, and the weeks ending July 10, 2010 through October 1, 2011. (Complaint, ¶3). In reliance on the Defendant's representations, the Plaintiff paid the Defendant a total of $12,678.00 in benefits for which she was not qualified. (*Id*. at ¶¶6-7). In short, the Plaintiff seeks a determination that the Defendant's debt is nondischargeable on account of allegedly false representations made by the Defendant when she submitted her continued claims for benefits over the phone.

To continue receiving benefits from the Plaintiff after filing an initial claim, each week the Defendant was required to certify over the phone that she was unemployed by responding to a series of questions posed by the Plaintiff. There was no live person on the other end of the call. In response to the Plaintiff's questions, the Defendant provided information by verbally responding with the words "yes" or "no", or by pressing a button on her phone. That information was then transformed into an internal record of the Plaintiff.

11

On several occasions, the Defendant certified that she was unemployed when, in fact, she was not. On the basis of the information the Defendant provided over the phone, however, the Plaintiff continued to pay the Defendant unemployment benefits, which she apparently received and kept. While the Defendant received unemployment benefits, she was not provided with and did not see her recorded answers to the questions asked over the phone about her eligibility to continue to receive unemployment benefits.[1] The Defendant ultimately filed bankruptcy, and the Plaintiff filed this adversary proceeding against the Defendant.

During the trial, the Defendant did not dispute that the Plaintiff relied on her representations or that her representations proximately caused the Plaintiff damages. To this point, the fact that the Plaintiff continued to pay unemployment benefits to the Defendant demonstrates the Plaintiff's actual and reasonable reliance on the Defendant's representations. However, the Defendant denies the Plaintiff's allegation that she knowingly and fraudulently represented that she had not earned any wages and was legally eligible to receive benefits when she submitted her continued claims for unemployment benefits. Although she could not specifically recall the responses that she provided in her weekly continued applications or the process of submitting a claim, the Defendant was consistent in her testimony that she has never made a false statement regarding her employment and has always stated that she was working reduced hours.

At issue here is whether the Defendant *knowingly* and *fraudulently* made a false representation with the intent and purpose of deceiving the Plaintiff when she submitted her weekly claims for unemployment benefits. Viewing the record in its totality, the Defendant's

---

[1] The Plaintiff did not present any evidence that the Defendant ever acknowledged, adopted, or even saw the internally generated computer record that purportedly represents the information she communicated to the Plaintiff.

12

acknowledgement that she submitted weekly claims for continued unemployment benefits does not compel the conclusion that the Defendant had the requisite intent and purpose of deceiving the Plaintiff. *But cf. In re Sanderson*, 509 B.R. 206, 209-10 (Bankr. W.D. Wisc. 2014) (holding that debt incurred for unemployment benefits erroneously paid based on the debtor's weekly phone certification that he remained unemployed was nondischargeable as one for money obtained by debtor's "false pretenses, false representation, or actual fraud," where the debtor stipulated that the debt was nondischargeable). Here, the Defendant has repeatedly stated both in her Answer and throughout her testimony that she has never made a false statement with regard to her employment and always advised the Plaintiff that she was working reduced hours. *But cf. In re O'Brien*, 11 B.R. 27, 31 (1990) (finding the debtor lacked credibility where he continued with his misrepresentation on the witness stand and later conceded that he was working when he received unemployment benefits). The Plaintiff did not introduce sufficient evidence to refute the Defendant's testimony and support a finding that the Defendant had the requisite intent.

As to the element of fraud, the Plaintiff must prove that the circumstances imply a fraudulent intent by the Defendant. The Plaintiff did not establish that the Defendant received the Unemployment Guide, that the Defendant read the Unemployment Guide, that the Defendant understood how to submit a claim for continued benefits over the phone, or that a representative of the Plaintiff advised the Defendant how to submit a claim over the phone. Although the Plaintiff established that it is the Plaintiff's ordinary practice to mail claimants a copy of the Unemployment Guide each time a claim is filed and to provide instructions for submitting claims, the Plaintiff did not establish that these steps were taken by the Plaintiff in the

13

Defendant's case. The evidence presented establishes that the Plaintiff did not prove this element by a preponderance of the evidence. Accordingly, the Court cannot conclude that the Defendant knowingly and fraudulently made a false representation to the Plaintiff.

The Plaintiff did not establish, by a preponderance of the evidence, that the Debtor knowingly and fraudulently made a false representation with the intent and purpose of deceiving the Plaintiff when she submitted her unemployment benefits claims by responding to weekly phone questionnaires. Accordingly, all of the elements have not been proven by a preponderance of the evidence to make a finding of nondischargeability. As a result, the Plaintiff's claim for unemployment benefits is not excepted from the Defendant's discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

### b. Fines, Penalties, or Forfeitures

11 U.S.C § 523(a)(7) excepts from discharge any debt "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss…." In *Kelly v. Robinson*, the Supreme Court observed that "[o]n its face, [section 523(a)(7)] creates a broad exception for all penal sanctions, whether they be denominated fines, penalties, or forfeitures. Congress included two qualifying phrases; the fines must be both 'to and for the benefit of a governmental unit,' and 'not compensation for actual pecuniary loss.' … Unlike an obligation which arises out of a contractual, statutory or common law duty, here the obligation is rooted in the traditional responsibility of a state to protect its citizens by enforcing its criminal statutes and to rehabilitate an offender by imposing a criminal sanction intended for that purpose." 479 U.S. 36, 41, 51 (1986). *Kelly* stands for the proposition that obligations that are primarily penal in nature are excepted from discharge,

14

regardless of whether the obligation is labeled a "fine, penalty, or forfeiture." *In re O'Brien*, 110 B.R. 27, 33 (Bankr. D. Colo. 1990).

The holding in *Kelly* has been applied to punitive obligations in non-criminal contexts, including statutory penalties assessed against those who fraudulently received state unemployment benefits. *See In re O'Brien*, 110 B.R. at 33; *cf. Kelly*, 479 U.S. at 51 n.13 (noting that the main purpose of the language "compensation for actual pecuniary loss" was to prevent section 523(a)(7) from being applied to tax penalties). In this case, the Plaintiff assessed thirty-nine weeks in administrative penalties against the Defendant pursuant to Connecticut General Statutes § 31-273(b)(2), which provides in relevant part:

> [A]ny person who has made a claim for benefits . . . and has knowingly failed to disclose a material fact in order to obtain benefits or to increase the amount of benefits to which such person may be entitled . . . shall forfeit benefits for not less than one or more than thirty-nine compensable weeks following determination of such offense . . . . This penalty shall be in addition to any other applicable penalty . . . and in addition to the liability to repay any moneys so received by such person . . . . Conn. Gen. Stat. § 31-273(b)(2).

The plain language of the statute demonstrates that the purpose of the penalty is to punish fraud, not to compensate the State of Connecticut for an "actual pecuniary loss." As discussed above, the Plaintiff has not established by a preponderance of the evidence that the Defendant knowingly and fraudulently made a false representation with the intent and purpose of deceiving the Plaintiff. Absent the requisite finding of fraud, the penalties assessed by the Plaintiff are not excepted from the Defendant's discharge under Section 523(a)(7).

## IV. CONCLUSION

A review of the record and the evidence introduced at trial establishes that the Plaintiff's evidence is insufficient to prove each element of its case under 11 U.S.C. § 523(a)(2)(A) or 11

15

U.S.C. § 523(a)(7).   For the reasons set forth above, judgment will enter against the Plaintiff and in favor of the Defendant.

DATED: __March 30, 2017____

*Julie A. Manning*
Chief United States Bankruptcy Judge
District of Connecticut